THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
September 17, 2012

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Baroness Small Estates, Inc.

v.

American Wine Trade, Inc.

_____

Cancellation No. 92051369

_____

Clinton J. Cusick of Muskin & Cusick LLC for Baroness Small Estates, Inc.

John F. Sullivan of Inslee, Best, Doezie & Ryder, P.S. for American Wine Trade, Inc.

_____

Before Seeherman, Kuhlke and Wolfson, Administrative Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

Baroness Small Estates, Inc. (petitioner) has petitioned to cancel the registration of American Wine Trade, Inc. (respondent) for CMS in the stylized lettering shown below for wine.[1]

---

[1] Registration No. 2984716, issued August 16, 2005; Section 8 affidavit accepted.

# CMS

The grounds recited in the petition for cancellation were fraud, genericness, abandonment and mere descriptiveness.  The grounds of fraud and abandonment were based on allegations that the labels for respondent's wine showed the trade name "Hedges Cellars," and this is the name of an entity different from respondent.  The Board subsequently granted summary judgment in favor of respondent on these grounds, respondent having demonstrated that there was no genuine dispute that "Hedges Cellars" and "Hedges Family Estate" are trade names of respondent.  See Board order dated March 1, 2011.  Accordingly, the only grounds that remain are genericness and mere descriptiveness, with petitioner alleging, with respect to these grounds, that the CMS mark is a generic acronym for the ingredients that are contained in the wine, namely cabernet, merlot and syrah; that the mark is a merely descriptive acronym for the ingredients in the wine, and was merely descriptive at the time the mark was registered, and that it did not have secondary meaning at the time it was registered, and does not have secondary meaning now;

and that petitioner has standing because it is in the business of selling wines, is a competitor of respondent, and is in a position to use CMS in a descriptive manner. Respondent denied these allegations in its answer.[2]

By operation of the rules, the record includes the pleadings and the file of the registration sought to be cancelled. Petitioner has submitted, by notices of reliance, the registration certificate for the registration at issue in this proceeding, and a label taken from that registration file;[3] copies of petitioner's registrations for marks covering wine, showing current status and title, for the purpose of establishing petitioner's standing; respondent's responses to certain requests for admission and interrogatories propounded by petitioner; and printouts from various Internet websites. Respondent has submitted, under notices of reliance, excerpts from printed publications; petitioner's responses to certain requests for admission; and Internet materials. Respondent also

---

[2] Respondent also asserted as affirmative defenses lack of standing, laches and unclean hands, but did not pursue these defenses in its brief. We do not consider respondent's statement, in connection with its argument on the generic and descriptiveness claims, that "Baroness had no objection to the CMS mark during the many years that Baroness was a distributor of CMS wines," brief, p. 20, to be an argument in support of a laches defense. Accordingly, we treat these affirmative defenses as having been waived.

[3] As noted, the registration file is automatically of record by operation of Trademark Rule 2.122(b)(2), and therefore there was no need to submit these documents by notice of reliance.

took the testimony deposition, with exhibits, of Thomas Hedges, one of the owners of respondent.

The proceeding has been fully briefed.[4]

Facts

Respondent adopted CMS as a trademark in 2001, and first used it for a red wine that was described as a blend of cabernets, merlot and syrah, consisting of 57& cabernet sauvignon, 36% merlot, 5% syrah and 2% cabernet franc. In 2004 respondent began using CMS for a white wine which is a blend of chardonnay, marsanne and sauvignon blanc. For two years, in 2005 and 2006 respondent also used CMS for a dry rosé wine; the label states that it consisted of cabernet sauvignon, marsanne and syrah.

Standing

Petitioner has made of record several registrations it owns for marks for wine, thus showing that it is in the wine business and is a competitor of respondent's. This is sufficient to establish petitioner's standing. See Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d

---

[4] On December 9, 2011, the Board granted petitioner's motion to strike the fourth notice of reliance submitted by respondent with its trial brief, and deferred ruling on the motion to strike any references to that notice of reliance in respondent's brief. We grant the motion to strike to the extent that any statements or arguments made in the brief based on the stricken evidence have not been considered. We also give no consideration to the information in footnote 4 of petitioner's brief regarding a Fall 2011 catalog that was accessed after the close of the trial period and is not of record.

1842 (Fed. Cir. 2000); Lipton Industries, Inc. v. Ralston

Purina Co., 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

Genericness

In H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc., 782 F.2d 987, 228 USPQ 528 (Fed Cir. 1986), the Court laid out a two-step inquiry for determining genericness:

First, what is the genus of goods or services at issue?

Second, is the term sought to be registered or retained on the register understood by the relevant public primarily to refer to that genus of goods or services?

The parties do not dispute that the genus of goods in this case is "wine." Petitioner has stated, at page 11 of its brief, that "The genus of goods is wine." Respondent has admitted petitioner's request for Admission No. 3: Admit that wine is the genus of the goods. We agree with the parties that "wine" is the genus.

Thus, we proceed to the second part of the test, and a determination of whether CMS is understood by the relevant public to refer to the genus of the goods. It is petitioner's position that the public understands that cabernet, merlot and syrah are the generic names of wines; and that consumers would understand CMS to refer to these generic terms.[5] We need not reiterate here the evidence as

---

[5] Although petitioner recognizes that respondent uses CMS in connection with a white wine containing chardonnay, marsanne and sauvignon blanc, the petition to cancel asserts that CMS is generic for the ingredients cabernet, merlot and syrah, and that is the basis for its claim that CMS is generic. See paragraph 1

to the generic nature of the names of the individual varietals since, as the Board explained in its March 1, 2011 order, even if grape varietal names such as merlot or syrah are generic for wines made from those grapes, it does not automatically follow that respondent's mark CMS is generic.  Rather, as noted by the Board, "The question to be answered is whether the initials for generic or merely descriptive terms, or a combination thereof, are also generally recognized and used as an accepted abbreviation for the term itself."  See Modern Optics, Inc. v. Univis Lens Co., 234 F.2d 504, 110 USPQ 293, 295 (CCPA 1956) ("[A]s a general rule, initials cannot be considered descriptive unless they have become so generally understood as representing descriptive words as to be accepted as substantially synonymous therewith"); see also In re Council on Certification of Nurse Anesthetists, 85 USPQ2d 1403, 1411 (TTAB 2007) ("it is not automatically the case that the initial letters of a generic term are recognized as being substantially synonymous with such term"); and Capital Project Management Inc. v. IMDISI Inc., 70 USPQ2d 1172, 1179 (TTAB 2003) (whether initials for a generic term are themselves a generic term is a separate issue).

---

of petition to cancel.  This is also the basis for the arguments in its brief.

Accordingly, petitioner has the burden of showing that the purchasing public understands CMS primarily to refer to wine.

In order to show that CMS is recognized as a generic term for wine, petitioner has submitted evidence showing use of CMS by third parties that it asserts is generic use. We set forth below the evidence that petitioner has submitted, interspersing these listings with evidence directed to it submitted by respondent, as well as our comments. As an initial comment, we point out that there is no evidence that the individual letters "C," "M" and "S," when used in connection with wine, have the meaning of "cabernet," "merlot" or "syrah" and, indeed, the materials submitted by petitioner show that there are various grape varietals that begin with these letters.

The website for Lake Chelan Winery lists, among its current wines, "2008 CMS (Cabernet, Merlot, Syrah)." (Petitioner's notice of reliance Exhibit G, pp. 3-4). However, respondent has submitted a virtually identical listing from the same Lake Chelan Winery website which lists "2008 Cabernet, Merlot, Syrah" — without any reference to CMS. (Notice of Reliance Exhibit D). The webpage submitted by petitioner, with the CMS initials, states it was accessed on May 19, 2011, while the webpage

8

submitted by respondent was downloaded on July 13, 2011. Thus, even if this third party used CMS in a generic manner (and it is not clear to us whether consumers would view this term as generic or as a trademark, given that some of the wines listed on the webpage are identified by generic terms and some are identified by trademarks, e.g., "2009 Pinot Grigio" and "2008 Rivers Bend Estate Syrah"), it does not appear that this listing was available to be accessed for a very long period of time in terms of having significant public exposure.

There are several exhibits relating to Palarea wine. The website http://terroirwinecellars.com has what is identified as a "Palarea CMS Shelf Talker" which shows, at the top, in large letters, "Palarea Cabernet Sauvignon/Merlot/Syrah." Below that, as part of the general text, is the statement that "Palarea CMS is a seductive, estate grown blend made of equal parts Cabernet Sauvignon, Merlot and Syrah." It is unclear how this usage of CMS would be viewed. It could be understood as part of the trademark Palarea CMS or as being derived from the varietal names that make up the wine, rather than as a generic term for the wine. Petitioner has also submitted a webpage from flickr.com which it states was posted by Terroir Wine Cellars. It shows a photograph of the Palarea

wine bottle.  The text under the photograph shows, in larger letters, "Palarea C.M.S." and below that is "Palarea C.M.S. 2005 Tinto, Varietals: 34% Cabernet Sauvignon, 33% Merlot, 33% Syrah."  "C.M.S." as shown on this webpage could as easily be viewed as a trademark than as the generic term for the blend.  A page from a different website, lerinwines.vpweb.com,[6] featuring Palarea wine shows "Palarea C.M.S. 2005" in large letters, above a picture of the bottle of wine.  The text has "Varietals" and lists "34% Cabernet Sauvignon 33% Merlot and 33% Syrah."  This was the only page from that website that was submitted, and there is no context for the listing, such as indicating this is a company that sells the wine, or someone that is merely showing various wines.  Thus, we cannot determine anything about public exposure to this webpage.  Further, the usage of "C.M.S." on the webpage could as easily be viewed as part of the trademark as it could be as a generic term.  A March 11, 2011 article in "Entrepreneurship," http://madduxpress.com, about a wine importer states that "By 2010 Clear's wines landed on the shores of New York to critical acclaims and awards beginning with Palarea CMS (Cabernet Sauvignon/Merlot/Syrah) followed by Palarea

---

[6]  Respondent apparently typed in the urls and dates the websites were accessed on the webpages it submitted, so this url does not show a prefix such as "www" or "http."

10

Merlot and Gran Passion Cava Brut Reserva." Again, "CMS" may as easily be viewed as a trademark for the wine as a generic term for the blend of varietals. Certainly the inclusion of the names of the varietals indicates that consumers would not readily understand CMS per se to be the generic term for such a blend.

On June 9, 2011, respondent contacted Terroir Wine Cellars, the seller of Palarea wine, in connection with these various uses of CMS discussed above. Terroir Wine Cellars responded on June 21, 2011 that it was never its intention to infringe on respondent's trademark, and that it had removed or changed all mentions of the trademark CMS from its website and marketing materials. The shelf talker on the Terroir Wine Cellars website that was downloaded on July 13, 2011 and submitted by respondent confirms this, in that there is no mention of CMS on that webpage.[7]

The website for Flerchinger Vineyards, www.flerchinger.com, includes the text, "And to give you a sneak preview, our 2011 offerings will include estate grown and bottled Merlot and Syrah and estate bottled Cabernet,

---

[7] Petitioner asserts that Terroir Wine Cellars continues to use Palarea CMS because there is a reference in an article to the serving of Palarea CMS at a dinner in connection with the Florida Winefest & Auction. http://finance.bostom.com. However, that article is dated April 7, 2011, well before respondent sent Terroir Cellars the cease and desist letter.

Cabernet-Merlot and Cabernet-Merlot-Syrah (CMS)." This indicates that "CMS" is a term that is used to refer to "Cabernet-Merlot-Syrah." Respondent submitted evidence that it had sent a cease and desist letter to Flerchinger Cellars on June 6, 2011, and respondent's owner testified that Flerchinger responded that they would not have used CMS if they had known it was respondent's trademark. Although the responsive letter was not made of record, respondent did submit a copy of the same webpage submitted by petitioner. Petitioner's exhibit shows this webpage was accessed on May 19, 2011; respondent's submission of this same webpage, printed on July 13, 2011, does not include any reference to "CMS." Thus, respondent's exhibit supports the statement of its owner. Further, it appears that the amount of time the Flerchinger website used CMS was quite limited, thereby raising a question as to what exposure the public had to this usage of CMS.

Petitioner submitted a webpage from Snooth, www.snooth.com, showing "no current availability" for "Corvidae Rook Cms '08 2008," and containing a review from Green Jug Fine Wine: "Corvidae's Rook is a blend of Cabernet Sauvignon, Syrah, and Merlot. The ripe and rich Cabernet flavors prevail—juicy loganberry, cassis, and a base note of black plum and cherry. Syrah adds richness,

and Merlot smooths the velvet finish." Respondent made of record a cease and desist letter it sent to the owner of Corvidae Wine Company, and although the responsive letter is not in the record, respondent's owner testified that Corvidae's response was that it would not have used CMS if they had known it was respondent's trademark, and they would cease use.[8]

The final third-party use of CMS submitted by petitioner is a webpage headed "Australian Cabernet Selections", www.ericksonfinewines.com, which contains a listing from the vineyard "Elderton" for, under the heading "Varietals," "CMS (Cabernet/Shiraz/Merlot)," vintage 2000. It also lists, under "Varietals," wines that appear to be combinations of varietal names with trademarks, such as "Cabernet Sauvignon Mulberry Tree" and "Cabernet Sauvignon Brookman," and others that are only varietal names or combination varietal names, such as "Cabernet Sauvignon" and "Cabernet-Merlot."

We have, thus, evidence of five different wines for which the term CMS has been used. For four of those uses, the evidence is that the makers of those wines have ceased

---

[8] The specific testimony, in response to the question about responses by winemakers who received respondent's cease and desist letters, was "…their answer was, in every case, 'We had no intention of marketing this had we known, and now that we know, we will drop everything.'" Hedges, p. 17.

use of CMS, and it is not clear, for any of the uses, to what extent there has been public exposure to them. See In re Country Music Association Inc., 100 USPQ2d 1824, 1830 (TTAB 2011) (merit found in applicant's argument that the examining attorney's Internet evidence of third-party usages are relatively obscure). The mere fact that one can do a search on the Internet and find, for example, a photograph on the flickr website, does not mean that consumers will be aware of this photograph. As Judge Rich said in connection with NEXIS searches, "It is indeed remarkable to see the thoroughness with which NEXIS can regurgitate a placename casually mentioned in the news." In re Societe Generale des Eaux Minerales de Vittel S.A., 824 F.2d 957, 3 USPQ2d 1450, 1451 (Fed. Cir. 1987). The same is certainly true for words that can be retrieved by an Internet search. Moreover, the usage of CMS in the various websites is mixed, at best. A mixture of usages is not sufficient to show, by clear evidence, that the purchasers of wine view CMS as a generic term for wine. In re Merrill Lynch, Pierce, Fenner, and Smith Inc., 4 USPQ2d 1141, 1143 (Fed. Cir. 1987); In re America Online Inc., 77 USPQ2d 1618, 1623 (TTAB 2006).

Petitioner has also submitted a listing from the website Abbreviations.com, www.abbreviations.com, which is

an acronym and abbreviation search site. In response to the question "What does CMS stand for?", it retrieved the answer "Cabernet Merlot Syrah" and "We have 91 more definitions for CMS." The answer does not indicate the basis for listing that CMS stands for these varietal names, or when it was first listed as such. Respondent submitted a number of references showing no listing for CMS as having a meaning for wine. For example, the response of Acronym Finder, www.acronymfinder.com, to the question "What does CMS stand for?" lists 278 meanings, including Canadian Mathematical Society, Cougar Mountain Software, Carver Middle School (as well as Carmel Middle School, Camden Middle School, Columbia Middle School and several other middle schools), Crowd Management Services, California Map Society and Center for Metalloenzyme Studies. Acronym Finder's Acronym Attic, www.acronymattic.com, has 250 more, unverified meanings for CMS. Dictionary.com lists a computing dictionary meaning, while the 2005 edition of The American Heritage Abbreviations Dictionary lists for "CMS," "The Chicago Manual of Style" and "command management system." There is no listing for "CMS" in the online Merriam-Webster dictionary that was printed on July 31, 2011, www.merriam-webster.com, or in the Wine Spectator glossary that was searched on July 13, 2011, nor any wine-

15

related listings in the entry for CMS in Wikipedia, downloaded on July 15, 2011, or in Wiktionary, www.wiktionary.org, which entry was last modified on April 8, 2011. Respondent also submitted the result of an inquiry for "chardonnay marsanne sauvignon blanc" made on Abbreviations.com showing that no listings were retrieved.

Thus, in all of these reference works, there is only a single entry for CMS as meaning "cabernet sauvignon, merlot, syrah", which was found in Abbreviations.com. We do not find this evidence particularly persuasive of the genericness of CMS in light of the evidence showing that there is no wine-related meaning for this term, including in a glossary of wine terms. It is further unclear whether Abbreviations.com lists meanings for CMS that may be trademarks or proper names, since of the 92 meanings for CMS that Abbreviations.com states are in its database, petitioner listed only the meaning of "cabernet sauvignon, merlot, syrah."[9] Thus, we cannot conclude, on the basis of the single listing in Abbreviations.com, that CMS has a generic meaning for wine.

Petitioner has also submitted evidence about the derivation of respondent's mark CMS, and there is no

---

[9] The 278 meanings shown by Acronym Finder, as shown above, do include trademarks and trade names.

question that it was derived from the initials of the varietals that make up the red wine for which the mark is used.  Mr. Hedges testified that he came up with CMS because "in a way, [it] related to what was in the bottle originally."  p. 7.  In response to Interrogatory No. 3 about the circumstances under which respondent adopted CMS as its mark, respondent answered that "the branding idea came from the first letters of Cabernet(s), Merlot, and Syrah."  Petitioner submitted a number of articles about respondent's wine that make this point about the derivation of the mark, including the following:

> … What's C.M.S.  Cabernet, Merlot, Syrah, duh.
> You want creative for this kind of price, too? ….
> [review of Hedges 2009 C.M.S. Columbia Valley
> Cabernet/Merlot/Syrah]
> Wine Exchange, www.winex.com
>
> Hedges makes a number of different wines with
> their flagships being a group of blends.  The
> entry level red blend C.M.S. is a blend of
> Cabernet Sauvignon (the "C"), Merlot (the "M"),
> and Syrah (the "S").  [entry for March 1, 2010
> entitled "Between the – Hedges 2008 CMS, 2006
> Three Vineyards – Columbia Valley, Red Mountain"]
> Yak Yak Wine, www.yakyakwine.com
>
> Washington State has been surprising people for a
> long time when it comes to producing great wines
> and the CMS by Hedges is certainly one of those
> great bottles turning heads around the world. …
> The CMS stands for Cabernet Sauvignon, Merlot,
> Syrah – the major grapes used to make this soon
> to be classic wine of the Pacific Northwest.
> [review on Gremolata website for "CMS Columbia
> Valley by Hedges 2005"]
> http://gemolata.com

17

… Hedges winemaker Pete Hedges has perfected the art of blending several grapes into tasty red and white wines.
Both are labeled CMS for the grapes they contain. The red is a blend of Cabernet Sauvignon, Merlot and Syrah, while the white is a blend of Chardonnay, Marsanne and Sauvignon Blanc.
[May 20, 2009 article entitled "Woehler on Wine: Hedges and Fidelitas," printed on the website Wine Press Northwest]
www.winepressnw.com

… CMS stands for the blend of grapes in this delicious wine, 39% Cabernet Sauvignon, 45% Merlot, and 16% Syrah. [webpage for The Wine Country, featuring "Hedges 2009 CMS Columbia Valley"]
www.thewinecountry.com

… "CMS" Red stands for 46% Cabernet, 48% Merlot and 6% Syrah.  [description of "Hedges 'CMS' Red 2009 (Columbia Valley, Washington)" appearing on website Drink Up NY]
www.drinkupny.com

… Speaking of the logo, CMS isn't something random, it's got meaning.  CMS stands for Cabernet Sauvignon, Merlot and Syrah.  Their white CMS is another blend that I'll have to review later.  [article entitled "Wine Review – CMS Red"]
http://babblingaboutnothing.com

As these articles show, "cabernet sauvignon," "merlot" and "syrah" are generic names for the varietals that are used in the wine.  However, the fact that a term is derived from individual generic words or even a listing of generic words does not necessarily make the derived term generic. Nor does the fact that one can figure out the derivation of

18

a term by seeing it in the context of the generic words make that term generic.

We have carefully reviewed all of the evidence of record, as well as all of the parties' arguments, and we find that petitioner has not proved that the consuming public views CMS as a generic term for wine. See Modern Optics, 234 F.2d 504, 110 USPQ at 295. Accordingly, the petition for cancellation on the ground of genericness is dismissed.

<u>Mere Descriptiveness</u>

In addition to its claim that respondent's mark is generic, petitioner seeks cancellation of the mark on the ground of mere descriptiveness. Petitioner has limited its arguments to asserting that the mark would be recognized as an abbreviation for "cabernet merlot syrah"; it makes no claim that the mark is descriptive of white wine because it would be recognized as an abbreviation for "chardonnay marsanne sauvignon blanc."

The Federal Circuit set forth the principles for determining whether a mark is merely descriptive (and therefore not inherently distinctive) or suggestive:

> Whether a given mark is suggestive or merely descriptive depends on whether the mark "immediately conveys … knowledge of the ingredients, qualities, or characteristics of the goods … with which it is used", or whether

19

> "imagination, thought, or perception is required
> to reach a conclusion on the nature of the
> goods."

In re Gyulay, 820 F.2d 1216, 3 USPQ2d 1009 (Fed. Cir. 1987) (ellipses in original, internal citations omitted).

The evidence, as discussed above, shows that, for the wines respondent currently sells, "cabernet sauvignon," "merlot" and "syrah" are the names of the grape varietals contained in its red wine, and that the names "chardonnay," "marsanne" and "sauvignon blanc" are the names of the varietals contained in its white wine. As such, each of the terms describes an ingredient of the wine. However, CMS can be considered merely descriptive of the wines only if consumers would immediately understand, upon seeing the mark CMS in connection with wine, that the wine contains the particular set of three varietals. Again, petitioner has not argued that CMS is descriptive of white wine, so we confine our discussion to whether or not CMS is merely descriptive of red wine.[10]

Petitioner asserts that CMS is derived from the first letters of the descriptive words cabernet, merlot and syrah, and argues that the relevant consumers would understand that CMS, used in connection with wine, is an

---

[10] Indeed, even in its petition for cancellation, petitioner has asserted only that CMS is descriptive of the ingredients cabernet, merlot and syrah contained in respondent's wine.

20

abbreviation of cabernet, merlot and syrah. We agree, as noted above, that CMS is derived from the first letters of the varietal names. But simply because a trademark is derived from the first letters of descriptive or even generic words does not mean that the trademark would be recognized as an abbreviation for these words. See, e.g., Modern Optics, 234 F.2d 504, 110 USPQ at 295. Certainly there is no evidence that "C" is a recognized abbreviation for "cabernet sauvignon" or that "M" is a recognized abbreviation for "merlot" or that "S" is a recognized abbreviation for "syrah." In fact, petitioner's own evidence, excerpts from Wine Enthusiast Magazine, shows that there are several varietals that begin with the letters "C" and "M" and "S," for example, cabernet franc, malbec, mourvedre and sangiovese.

As for whether CMS would be recognized as an abbreviation for this combination of varietals, the articles, etc. excerpted above that explain how the mark is derived, or what CMS means, actually show that the mark CMS for wine does not directly and immediately convey the meaning of the three varietals. The authors of the various articles and reviews and sales information believed that they needed to spell out the connection between CMS and the names of the varietals that are contained in the wine, and

that readers would not immediately understand that the mark CMS has the meaning of cabernet sauvignon, merlot, syrah. Although some consumers may be able to figure out that the mark was derived from the initials of the varietals comprising the wine, the process of recognizing that derivation requires some thought, and that is the very essence of a suggestive mark.

Petitioner has pointed to the following testimony by Mr. Hedges, at pages 18-19 of his deposition transcript, asserting that this is an admission "that the public in fact understands CMS primarily to refer to the goods, and not the source of the goods," brief, p. 21:

> Q. Do you know if the public has any understanding as to what CMS means?
>
> A. I think definitely locally they do, certainly, because we've been in the market for a long time. Perhaps not quite as good an understanding around the country, but I believe they think it's a brand that contains Cabernet Sauvignon, Merlot and Syrah.

We do not view this testimony as an admission that the initials CMS have become so generally understood as representing the descriptive words "cabernet," "merlot" and "syrah" that the consuming public accepts CMS as substantially synonymous with those varietals. See Modern Optics, 234 F.2d 504, 110 USPQ at 295. Rather, we view Mr. Hedges' testimony as saying that people regard CMS as a

*trademark* for a wine that contains cabernet sauvignon, merlot and syrah, and not that CMS tells people directly that the wine contains these varietals.  And that the brand is more strongly recognized locally, where the wine has been more heavily marketed, than in other areas of the country.

Having carefully considered all of the evidence, we find that petitioner has failed to prove that CMS is merely descriptive for wine, and the petition for cancellation on this ground is dismissed.

Acquired Distinctiveness

In view of our finding that respondent's mark is not merely descriptive but inherently distinctive, we need not consider the claim that the mark had not acquired distinctiveness at the time of registration.

Decision

The petition for cancellation is dismissed.